# In the United States Court of Federal Claims

No. 14-173C

(Filed Under Seal**:** October 21, 2014)

(Reissued for Publication:  October 29, 2014)[1]

```
*************************************
                                    *
VFA, INC.,                          *
                                    *
                    Plaintiff,      *   Bid   Protest;   DoD's   Sustainment
                                    *   Management   System;   Subject  Matter
v.                                  *   Jurisdiction;  Standardization  Decision;
                                    *   Distributed  Solutions;  Definition  of
THE UNITED STATES,                  *   Procurement.
                                    *
                    Defendant.      *
                                    *
*************************************
```

*John E. McCarthy, Jr.*, with whom were *James G. Peyster* and *Robert J. Sneckenberg*, Crowell & Moring LLP, Washington, D.C., *Julia Huston* and *Daniel L. McFadden*, Foley Hoag LLP, Boston, Massachusetts, Of Counsel, for Plaintiff.

*A. Bondurant Eley,* with whom were *Stuart F. Delery*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Kirk T. Manhardt*, Assistant Director, and *Elizabeth A. Speck*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

OPINION AND ORDER

WHEELER, Judge.

Plaintiff VFA, Inc. ("VFA") is a provider of software and process solutions that can be used to assess and manage the condition of facilities at military installations.  VFA filed this action as a bid protest to challenge the decision of the Department of Defense

---

[1] The Court issued this opinion under seal on October 21, 2014 and gave the parties until October 28, 2014, to submit any proposed redactions of competition-sensitive, proprietary, confidential, or other protected information.  The parties did not submit any proposed redactions, and thus the opinion appears in its original form.

("DoD") to standardize its facility condition assessment needs through the Sustainment Management System ("SMS"). The U.S. Army Corps of Engineers Construction Engineering Research Laboratory ("CERL") developed the SMS software suite over many years, and the DoD claims ownership of SMS. The DoD uses SMS in making decisions about sustainment, restoration, and modernization of its facilities. VFA owns and markets a similar software product, and also provides inspection services for its customers. On September 10, 2013, the Under Secretary of Defense for Acquisition, Technology, and Logistics issued a memorandum to standardize the use of the SMS program at all of DoD's military installations.

VFA filed a bid protest in this Court on March 4, 2014, alleging that the DoD's standardization decision excludes VFA and others from competing for contracts to provide facilities management software, in violation of the Competition in Contracting Act, 10 U.S.C. § 2304 ("CICA"). Simply put, VFA contends that the DoD should be conducting competitive procurements for this software product, and that the September 2013 decision to standardize without any competition was arbitrary and capricious. On March 26, 2014, Defendant filed the certified administrative record, and on April 21, 2014, VFA moved for judgment on the administrative record. On May 12, 2014, the Government filed a motion to dismiss VFA's protest for lack of jurisdiction and lack of standing. The Government argues that an internal standardization decision is not a "procurement" for purposes of the Court's Tucker Act jurisdiction, and consequently VFA is not an interested party who may challenge such a decision. In the alternative, the Government filed a cross-motion for judgment on the administrative record, arguing that the agency had a rational basis for its decision.

The issue presented in this case is whether the Government must conduct a competitive procurement before using something that it already owns. By analogy, if the Government owned an apple orchard, must it go to the market to compare prices of other apples before picking in its orchard? Or, if the Government owned a fleet of cars, must it solicit prices from Hertz and Avis before driving the cars it already possesses? Although the Federal Circuit's broad interpretation of "procurement" in <u>Distributed Solutions, Inc. v. United States</u>, 539 F.3d 1340, 1345-46 (Fed. Cir. 2008) may make this issue worthy of discussion, in this case there was no procurement at all. To the extent CICA had any application, it would have come into play at the time of the software's original development, not at the time of intended use after the product had been developed.

As will be explained, the facts in this case were sufficiently muddled that the Court afforded VFA limited discovery regarding CERL's development of the SMS program, and the way in which SMS is used among the various military departments. The Court permitted document production and a deposition of Mr. Lance Marrano, the SMS Program Manager for CERL. This fact discovery occurred following the

Government's submission of Mr. Marrano's declaration with a reply brief in support of its motion to dismiss. Discovery consumed more time than is typical in a bid protest, but proved useful in clarifying the relevant facts. The Court also carefully considered VFA's reliance on "standardization" decisions from this Court, and on "insourcing" decisions where this and other courts have taken jurisdiction to review agency actions bringing service contract work in house. However, following full development of the case, the Court finds that the DoD's decision to use an SMS program it owns instead of conducting a competitive procurement is not an action that can be challenged in this Court. Accordingly, the Court grants Defendant's motion to dismiss VFA's complaint.

Factual Background

CERL's development of the SMS program began in 1975, almost 40 years ago, and is well-documented by the Government's patents. See Administrative Record ("AR") 1, 4, 7, 41, 1460-507, 2037-38. In the mid-1970s, CERL issued reports identifying significant building and asset management problems, prompting the need for a property management software solution. See AR 145, 177. As no suitable management systems were then available, the Government began funding the creation of its own software program. Id. Various modules of the SMS have been developed over many years, beginning with PAVER in 1977 for pavements and RAILER in 1988 for railroads. AR 41; Def.'s Mot. to Dismiss at 3. BUILDER was first released in 1990 to address real property management. Id. CERL and its contractors continue to develop and maintain these modules today. Def.'s Mot. to Dismiss at 3.

Beginning in 2007, some of the major DoD departments began implementing various modules of the SMS program. Id. The Army, through regulation AR420-1, designated PAVER, RAILER, and ROOFER as the only acceptable condition assessment tools for their respective asset categories. AR 43, 557, 574-75, 579. Also in 2007, the DoD issued a policy memorandum identifying PAVER and RAILER as the data format standards for pavements and rails when managing linear segmentation of property. AR 43. In 2008, the Marine Corps fully implemented BUILDER at all of its installations. Id. In 2009, the Navy adopted BUILDER to replace commercial software that did not meet its requirements. AR 44. In 2011, the Defense Logistics Agency approved BUILDER for its facility condition assessments, and the Air Force also began expanding the use of BUILDER. AR 44-45. In 2012, the Army and Army Medical Command conducted BUILDER pilot programs. AR 46. In 2011, Fiatech, a construction industry innovation organization, awarded the BUILDER module its Celebration of Engineering and Technology Innovation award for its widespread adoption and the nearly 75 percent annual savings it created for the Navy in its shore-side facility condition assessments. AR 1518-19.

In a federal agency as large as DoD, it became increasingly apparent that multiple and different facilities condition assessment tools across DoD installations generated inconsistent and incomparable data. Def.'s Mot. to Dismiss at 4. For example, in 2006, the DoD commissioned a report from Black & Veatch consultants, which concluded that facilities condition assessment "methodologies differed, sometimes substantially, between Defense Components and the type of information collected [] was therefore different." AR 330. These differences made "direct comparison of the results . . . difficult." AR 331. A 2007 Booz Allen & Hamilton report reached similar conclusions. AR 1018-19.

In 2012, Senate Report No. 112-26 noted that the DoD "does not have a set of standards or metrics that can be used to inform budget decisions and Congress on the minimal annual levels of funding required to recapitalize the physical plant at a rate that matches the design lives of facilities in the [DoD] inventory." AR 1508. The report further noted, "[b]udget pressures and other priorities can result in funds appropriated for facility sustainment being used to fund other categories of base operating support. This leads to facilities that do not receive minimal levels of annual preventative maintenance, and are not modernized to current standards for safety, security, and technology." Id. The report concluded that, "[o]ver the long-term, underfunded maintenance on [DoD]'s facilities costs the Department more in eventual repairs and replacement." Id.

Thereafter, to address the concerns raised by the consultants and Congress, the DoD made a policy decision to standardize its facility condition assessments. Def.'s Mot. to Dismiss at 6; AR 4. As part of this policy, the DoD chose to standardize the software it developed and owns itself, which was widely used in almost all of its installations, and which had received recognition for cost savings. AR 4. On September 10, 2013, Under Secretary of Defense for Acquisition, Technology, and Logistics Frank Kendall issued a memorandum entitled "Standardizing Facility Condition Assessments." Id. Secretary Kendall outlined the DoD's intent to establish "a DoD-wide facility condition assessment process" to help create "a more credible asset management program" and to "support better buying power." Id. Secretary Kendall stated that the decision was made "to ensure consistent and reliable data necessary for sound strategic investment decisions in managing the Department's built environment." Id. Secretary Kendall named the SMS as the new standard, and described the SMS as having been developed by CERL. Id. He also referenced an SMS factsheet that further details the development history and functionality of the SMS. AR 4, 7.

The DoD then began to address the concerns of contractors who offered inspection services to the agency with their own software, including companies like VFA. AR 1; Def.'s Mot. to Dismiss at 7. As part of this accommodation, the DoD offered the SMS software to firms providing inspection services at no cost. AR 1. The DoD also provided

4

for firms that wished to continue using their own software in conjunction with these inspections, requiring only that "[each] contractor's proposal [provides] that its assessment protocol is aligned with the SMS assessment process . . . and . . . the contractor can migrate all data from its software/data file to the appropriate SMS software/data file as a contract deliverable."  AR 2.  This approach allowed the DoD to maintain uniform facilities assessment data for all of its installations while still allowing contractors to employ their own software.

In March 2014, six months after the DoD's September 10, 2013 standardization announcement, VFA filed this action.  VFA alleged in three counts: (1) DoD's standardization decision violates CICA's substantive requirement of full and open competition as well as procedural requirements for the use of "other than competitive" procedures; (2) DoD's standardization decision violates the Federal Acquisition Regulation's ("FAR's") similar substantive and procedural requirements; and (3) DoD's standardization decision was arbitrary, capricious, and an abuse of discretion.  The cross-motions for judgment on the administrative record and Defendant's motion to dismiss have been fully briefed, and the Court invited an additional round of briefing following document production and deposition of Mr. Marrano.  The Court heard oral argument on September 22, 2014.

## Discussion

### A.  Standard of Review

The Court must determine whether a plaintiff has established subject matter jurisdiction before proceeding to review the merits of the complaint.  Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005).  The jurisdiction of this Court is limited and extends only as far as prescribed by statute.  Id. at 1172.  Where subject matter jurisdiction is challenged, the plaintiff must establish the Court's jurisdiction by a preponderance of the evidence.  Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  If the Court finds that it lacks subject matter jurisdiction, it must dismiss the claim.  Gluck v. United States, 84 Fed. Cl. 609, 614 (2008).

### B.  DoD's Ownership of SMS

As noted, in a reply brief in support of its motion to dismiss, the Government submitted the declaration of Mr. Lance Marrano, the SMS Program Manager for CERL.  The Government included this declaration to inform the Court on the question of DoD's ownership and development of the SMS software suite.  VFA argues that the DoD does not actually own the SMS software, but instead pays licensing fees to its developers.  VFA also argues that the DoD installations must pay their own substantial fees to CERL

in exchange for using the SMS. As such, the DoD was making a procurement decision when it decided to have its component agencies "buy" software from CERL instead of conducting a competition among the firms and products available in the commercial market. In these circumstances where the Government offered a declaration with a reply brief and moved to supplement the administrative record with this declaration, the Court deemed it appropriate to grant VFA limited discovery. The Court afforded VFA the opportunity for document production and a deposition of Mr. Marrano on the matters covered in his declaration. The Court added these materials to the administrative record. Upon close examination of the declaration, the deposition, and the additional documents, the Court finds that the DoD does own the SMS, and does not purchase or license the software from CERL, which is a component of the DoD itself.

According to Mr. Marrano, "[t]he Government does not merely possess a license for SMS software; it actuals owns [it] and the underlying patents outright." Marrano Decl. at 2. VFA challenges this assertion based on the facts that (1) it costs money for DoD to use the SMS, (2) the SMS was developed with the help of private contractors, and (3) VFA believes the private contractors likely hold title to the software. However, the administrative record does not support these claims.

First, it is clear that the DoD owns the rights to the SMS. The Army has patented "key elements of the BUILDER module," and each patent states, "the conditions under which this invention was made entitle the Government of the United States . . . to the entire right, title, and interest therein . . . ." See, e.g., GOV0000773, GOV0000795, GOV0000918, GOV0000934, now included in the administrative record. The private contractors that helped research and develop the SMS have given the Government "the entire right, title and interest in and to the Work, and any registrations and copyright applications relating thereto, and any extensions and renewals thereof, including all works based upon, derived from, or incorporating the Work, throughout the World" as part of their contracts with DoD. See Def.'s Resp. to Pl.'s Supp. Mem. at 4; see also, e.g., GOV0000766 (in relevant part, Contract Nos. W9132T-06-D-0003, and DACA42-01-D-0005), GOV0000768 (Contract No. W9132-T-05-D0001), GOV0000770 (in relevant part, Contract Nos. W9132T-06-D-0003, and DACA42-01-D-0005). Still other contracts incorporated the language of the Defense Federal Acquisition Regulation Supplement ("DFARS") 252.227-7020, Rights in Data – Special Works, which provides that the "Government shall have unlimited rights in works first produced, created, or generated and required to be delivered under this contract." 48 C.F.R. § 252.227-7020(c)(1); see, e.g., GOV0001102, GOV2702, GOV2745, GOV2786. The Government has provided other examples of contract language granting the Government an unlimited right to the SMS work. The Court is satisfied that the DoD owns the software.

Second, VFA's claims that "DoD components pay to use the SMS software" are misleading and unsupported. VFA refers to the "over $5 million in 'SMS Funding' that CERL has received from DoD components since fiscal year 2010," arguing that this level of payment is no different than buying software in the commercial market. Pl.'s Suppl. Mem. at 5. While this characterization may be convenient in constructing an argument for a competitive procurement, it is unsuccessful here because the agency components are not independent actors in a commercial market, but are all part of the DoD. VFA essentially is protesting the exchange of funds among various military departments, known as Military Interdepartmental Purchase Requests ("MIPRs"). MIPRs are "nothing more than a vehicle for transferring funds internally within DoD in accordance with the Economy Act, [and are] not a document memorializing a commercial transaction with a third party." Def.'s Resp. to Pl.'s Supp. Mem. at 7; 31 U.S.C. § 1535. The statute itself forbids allowance for profit when transferring funds intra-agency, and thus serves to defeat the characterization by VFA, whether express or implied, that CERL is selling its software to the DoD components in a market-like manner. See 31 U.S.C. § 1535. Instead, SMS funding allocations emanate primarily from the SMS Configuration Support Panel ("CSP") of the Installations & Environment Functional Business Governance Board. Def.'s Resp. to Pl.'s Supp. Mem. at 11. The CSP determines how the agency as a whole will fund the SMS, and allocates this funding across the participating components. Id. Any additional or optional services requested by a component, such as a modification or component-specific improvement to the SMS, must be approved by the CSP. Id. Thus, VFA's characterization of the separate components as market actors is untenable because the DoD is allocating this funding on an agency-wide basis.

Ultimately, the Court finds that the DoD owns the SMS software for the purposes of this protest. To the extent that private contractors helped develop the software, the Government has shown that it received all of the necessary ownership rights and patents therefrom. When the DoD components transfer funds to CERL as reimbursement for using the SMS, the Government has shown that these are agency funding allocations documented through the use of MIPRs, and are not arms-length commercial transactions. Having found that the DoD owns the SMS software in question, the Court will now turn to the issue of subject matter jurisdiction.

### C.  Subject Matter Jurisdiction

Under the Tucker Act, this Court has "jurisdiction to render judgment on an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or proposed procurement." 28 U.S.C. § 1491(b)(1). In this case, VFA has challenged the government's actions under CICA and the FAR, but the key phrase for Tucker Act jurisdiction is that Plaintiff's protest must be "in

7

connection with a procurement or a proposed procurement." Id. Since neither the Tucker Act nor CICA define the term "procurement," the Federal Circuit has held that the term "procurement" includes "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." See Distributed Solutions 539 F.3d at 1345-46. The Federal Circuit applied this definition from what is now 41 U.S.C. § 111, which is part of the statute establishing the Office of Federal Procurement Policy ("OFPP"). See 41 U.S.C. Subt. 1.

While many courts have cited Distributed Solutions for the proposition that Tucker Act bid protest jurisdiction is broad, the holding remains limited by the facts of the case. Distributed Solutions involved an attempted circumvention of federal procurement law when the Government sought to acquire software for a joint program between the U.S. Agency for International Development ("USAID") and the State Department. See 539 F.3d at 1342. The Government delegated to a contractor the task of selecting private vendors to provide the software. See id. The Government, along with the designated contractor, issued a Request for Information ("RFI") which stated that the objective of the government's effort was to "select and implement acquisition and assistance solutions that meet the unique functional requirements of both [USAID and the Department of State]." Id. at 1346. The RFI specifically stated that it was "for market research purposes only" and would "not result in a contract award." Id. After reviewing the responses to the RFI, the Government told the vendors that it had "decided to pursue alternative courses of action." Id.

The contractor then issued its own RFI, and used the responses to select the software vendors it wanted. Id. The Government approved these selections. Id. Thus, the Government initiated a type of procurement competition without actually committing to award a contract to the best offeror, thereby circumventing applicable federal procurement laws. The court found that "unlike AT&T [Commc'ns, Inc. v. Wiltel, Inc., 1 F.3d 1201 (Fed. Cir. 1993)], the government used an RFI to solicit information from outside vendors, and then used this information to determine the scope of services required by the government." Id. at 1346. These events prompted the Federal Circuit to find that the RFI and the later software acquisition constituted a procurement, defining the term to include "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services. . ." Id. at 1345. The determination of need was in the form of an explicit Request for Information followed by government action. Thus, the Federal Circuit concluded that a procurement existed and that a legally compliant competition was required.

The present case is much different in key respects. Here, the DoD never contemplated or initiated a procurement process. The Government did not issue an RFI,

did not receive information from vendors, and did not plan to award any contract. From the DoD's standpoint, it already possessed the SMS program it wanted to use, and there was no reason to acquire anything. VFA is requesting a competitive procurement in order to sell to the Government something it already possesses. CICA's competition requirements may well have applied when the DoD originally developed the various SMS modules, but that development occurred long ago and is not before the Court.

1. Standardization Cases

Plaintiff argues for the application of other standardization decisions where this Court has interpreted the breadth of § 1491 jurisdiction broadly, namely Savantage Financial Services, Inc. v. United States, 81 Fed. Cl. 300 (2008), Google, Inc. v. United States, 95 Fed. Cl. 661 (2011), and McAfee, Inc. v. United States, 111 Fed. Cl. 696 (2013). While all three of these cases involved software standardization decisions by the Government, the Court finds that the similarities end there.

In Savantage, the Department of Homeland Security ("DHS") conducted a sole-source procurement for financial systems application software. DHS decided to standardize its software on the Oracle and SAP systems, signing a "Brand Name Justification" instead of conducting a competition. DHS then issued a solicitation for services to migrate to these systems. Plaintiff challenged the underlying standardization decision to use the software of Oracle and SAP, and this Court accepted jurisdiction of the protest. The Court found that DHS expanded its systems contracts with Oracle and SAP without any competition for the new work. Savantage, 81 Fed. Cl. at 305. Specifically, the Court ruled that the "expansion of work fits squarely within the congressional definition of 'procurement' because it is an acquisition of additional property or services from Oracle and SAP." Id. The Court rightly held that acquiring new work from a private vendor is, by definition, a procurement action on the part of the Government. Savantage stands in contrast to VFA's position. Here, VFA is challenging the DoD's decision to standardize its own software in an effort to maximize its use of existing resources rather than acquire new goods or services. This wholly internal action by the Government cannot be compared to the selection of a private vendor to provide goods or services without competition.

Similarly, in Google, the Department of Interior "restricted competition exclusively to the Microsoft BPOS-Federal and the Microsoft Desktop and Service Software for messaging and collaboration solutions," in effect standardizing on a single private vendor's product instead of conducting a competition. 95 Fed. Cl. at 672-73. As in Savantage, the Court accepted jurisdiction and sustained the protest requiring a competitive procurement. Once again, the agency was acquiring something new (an email messaging system) rather than using something it already had.

In McAfee, the Air Force conducted a brand-name, sole-source procurement for reconfiguration and strengthening of its network security technology. 111 Fed. Cl. at 696. The Air Force, without competition, decided to "move from multiple-source security to sole-source security, effectively cutting out [the Plaintiff] and all security providers other than Palo Alto [Networks]," another private vendor. Id. at 707. In all three of these software standardization cases, the Government attempted to conduct a sole-source procurement without any competition. The existence of a procurement triggered this Court's jurisdiction. It is a different circumstance altogether when the Government decides to forgo the private market and use its own existing resources.

2. Insourcing Cases

VFA argues in the alternative that the Court should follow the reasoning of recent "insourcing" cases, positing that the DoD's use of its own software to the exclusion of VFA and others constitutes "insourcing" and grants this Court jurisdiction. Specifically, VFA relies upon Fisher-Cal Industries, Inc. v. United States, 839 F.Supp.2d 218 (D.D.C. 2012), Rothe Development Co. v. Dept. of Defense, No. SA-10-CV-743-XR, 2010 WL 4595824 (W.D. Tex. Nov. 3, 2010), aff'd 666 F.3d 336 (5th Cir. 2011), Triad Logistics Services Corp. v. United States, No. 11-43C, 2012 WL 5187846 (Fed. Cl. Apr. 16, 2012), and Vero Technical Support, Inc. v. Dept. of Defense, 437 Fed. Appx. 766 (11th Cir. 2011). The Court also considered the holdings in Santa Barbara Applied Research, Inc. v. United States, 98 Fed. Cl. 536 (2011), and International Genomics Consortium v. United States, 104 Fed. Cl. 669 (2012).

In all of the cited insourcing cases, the DoD was obligated to compare cost efficiency between civilian and contractor personnel under 10 U.S.C. § 129a ("The Secretary of Defense shall establish policies and procedures for determining the most appropriate and cost efficient mix of military, civilian, and contractor personnel to perform the mission of the Department of Defense."). Each of the cases involved a required cost comparison, and this fact alone distinguishes them from the present case. The fact that the DoD compared the cost of the private contractor to its own hiring of civilian personnel is a significant step in the procurement process, and one that was never taken in this case. Further, each of these cases required the hiring of civilian personnel, not just the use of existing personnel, and thus involved an acquisition process.

In Fisher-Cal Industries, the district court found that a challenge to an Air Force decision to insource personnel for multimedia services was within the jurisdiction of the U.S. Court of Federal Claims. The case involved the hiring of civilian employees instead of the continued use of an outside contractor. Under either approach, the Air Force still required new workers, and was beginning an acquisition process when it decided where it

should obtain them.   The district court found the Air Force's employment decision to be part of the "federal contracting acquisition process." Fisher-Cal Industries, 839 F. Supp. 2d at 223 (quoting Distributed Solutions, 539 F.3d at 1346).  A comparable insourcing decision was made in Santa Barbara Applied Research, and this Court found jurisdiction there as well.

Similarly, in Rothe, the district court found a "decision not to acquire services from a competitive outside source, based on a detailed comparison of the costs of both public and private sources as required by the regulations at issue," is very much related to the "process of acquisition." 2010 WL 4595824, at *5.  In Triad, the plaintiff challenged yet another personnel insourcing decision, this time regarding vehicle operations and maintenance services for the Air Force.  The court in Triad acknowledged that "there is no binding, precedential authority regarding this court's jurisdiction to review DoD in-sourcing decisions." Id.  However, the Court proceeded to find jurisdiction over agency insourcing decisions.  Notably, Triad also involved "newly-hired employees" to perform the work previously performed by the plaintiff. Id.  In Vero, the Eleventh Circuit found Court of Federal Claims jurisdiction in another case involving the insourcing of personnel services, this time for weather forecasting and support services for the Air Force.

All of VFA's insourcing cases involved agency action found to be part of the federal acquisition process.  None of the cited cases involved standardizing a product already owned by the Government.  Thus, the present case is quite different from the insourcing cases.  Unlike in Fisher-Cal, Santa Barbara, Rothe, and Vero, where the statutes explicitly required the Government to compare the costs of personnel from a contractor to those it would hire directly, VFA has pointed to no regulation or guideline suggesting the DoD was under an obligation to compare the cost of the SMS to the software products offered in the commercial market.  Because it was not so required, the Government did not solicit any commercial pricing proposals, did not issue an RFI, and did not conduct an internal review or comparison of products.

Conclusion

In International Genomics, a contractor challenged the decision of the National Cancer Institute ("NCI") to assign a private operator the responsibility for procuring certain services needed to run an NCI project.  The case did not involve a standardization or insourcing decision, but is instructive on whether a disappointed contractor may challenge an internal agency decision unaccompanied by any explicit steps toward a procurement.  NCI had chosen to delegate the running of its Atlas program to a private contractor, not in order to circumvent competition, but "primarily for budget and efficiency reasons."  104 Fed. Cl. at 674.  The plaintiff protested this internal, non-procurement decision.

11

Judge Allegra of this Court questioned the logical end for this type of jurisdictional expansion.  He wrote, "as plaintiff sees it, the agency's discussions that precede such a decision, no matter how laconic or informal, begin the 'process for determining a need for property or services,' thereby giving rise to a 'proposed procurement,' the existence of which, in turn, triggers this court's jurisdiction." Id. at 676.  After considering the immediate implications of this expansion, Judge Allegra concluded that, "[c]arried to its logical end, plaintiff's reading of Distributed Solutions [] would also authorize this court to review any challenge to an agency's needs determination—no matter how nascent, informal, or abbreviated the process was leading up to that decision—so long as that 'process' resulted in a determination to forego the use of an outside contractor." Id.  In response to claims that this jurisdictional breadth could be cabined by the facts of the case, Judge Allegra found that it was not so easily done.  Instead, he warned that plaintiff's view of this court's jurisdiction "would unlock a veritable Pandora's box of bid protest challenges to many internal agency decisions that never ripen into government procurements . . . ," potentially allowing protests of "every agency decision not to procure a product or service." Id. at 676-77.

The Court agrees.  Allowing VFA to bring this case, where no procurement or cost comparison process was mandated or undertaken, would so broadly expand this Court's jurisdiction as to eliminate any restrictions of the Tucker Act.  Under VFA's theory of jurisdiction, every time the government chooses *not to* procure a good or service from a private contractor, and instead creates or develops something on its own, the providers of similar products and services would be able to challenge this decision, asking "why don't you buy from us instead?"  The Court is unwilling to open this "Pandora's box."  For the reasons stated above, the Defendant's motion to dismiss for lack of subject matter jurisdiction is GRANTED.

    IT IS SO ORDERED.

    s/ Thomas C. Wheeler
    THOMAS C. WHEELER
    Judge